**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
(Alexandria Division)

| | |
|---|---|
| **MICHAEL CAHILL** | ) |
| 6060 Baltimore Pike | ) |
| Littlestown, PA 17340 | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) Civil Action No. 1:19-cv-1614 |
| v. | ) |
| | ) |
| **CITY OF ALEXANDRIA,** | ) **JURY TRIAL DEMAND** |
| A municipal corporation organized under the | ) |
| laws of the Commonwealth of Virginia**,** | ) |
| | ) |
| *Defendant.* | ) |
| | ) |
| **SERVE:** | ) |
| | ) |
| **JOANNA ANDERSON, ESQUIRE** | ) |
| **ALEXANDRIA CITY ATTORNEY** | ) |
| 301 King Street, Room 1300 | ) |
| Alexandria, Virginia 22314 | ) |
| | ) |

## COMPLAINT

1.    Plaintiff Michael Cahill ("Plaintiff" or "Mr. Cahill") brings federal claims based on violations of the Family Medical Leave Act ("FMLA"), as amended 29 U.S.C. §2601, *et seq*.; violations of the Americans with Disabilities Act ("ADA"), as amended 42 U.S.C. §12101 *et seq.*; and violations of the Virginia Human Rights Act ("VHRA"), as amended § 2.1–714 *et seq.*; against his employer, Defendant City of Alexandria Fire Department ("AFD", "City", or "Defendant").

2.    Specifically this matter arises because Plaintiff has suffered harm as a result of the discrimination and retaliation he has faced as a disabled person requesting medical leave as a reasonable accommodation.  He also suffered harm when AFD retaliated and interfered

with his FMLA rights to the medical leave, unlawfully disciplined him for his use of sick

leave/medical leave, and prevented him from attending professional development classes.

## JURISDICTION AND VENUE

3.  This Court has federal question jurisdiction over the subject matter of this complaint

pursuant to 28 U.S.C. § 1331, because this is a civil action arising under the laws of the

United States.

4.  Venue is proper under 28 U.S.C. § 1391 in the Eastern District of Virginia because all or

substantial part of the events or omissions on which the claims herein are based occurred

in the Eastern District of Virginia.

## PROCEDURAL REQUIREMENTS

5.  On or about May 14, 2019, Plaintiff filed a charge of discrimination and retaliation with

the Equal Employment Opportunity Commission ("EEOC"). Such charge was filed within

300 days after one or more of the alleged unlawful employment practices in violation of

the ADA had occurred.

6.  On or about September 25, 2019, Plaintiff received a Notice of Right to Sue from the EEOC

that was dated September 23, 2019. This notice gave Plaintiff 90 days from the receipt of

the notice to file a Complaint related to his ADA claims.

## PARTIES

7.  Plaintiff Michael Cahill became an employee of AFD on April 25, 1994. At all times

relevant to this Complaint he was and still is employed as an EMS Captain.

8.  Defendant City of Alexandria is a municipal corporation organized under the laws of the

Commonwealth of Virginia. Defendant's corporate headquarters are located in Alexandria,

Virginia.   At all times relevant to this cause of action, Defendant was and still is Mr.

Cahill's employer within the meaning of all statutes relevant to this complaint.

## FACTS

9.    Mr. Cahill has been working for AFD as a paramedic ("Medic") for 25 years. He has

performed well for Defendant, receiving numerous positive performance evaluations over

the course of his 25 years with AFD.

10.    He received annual merit increases based on his performance.

11.    Mr. Cahill's disabilities include post-traumatic stress disorder ("PTSD") and depression.

Both disabilities substantially limit his major life activities of working, sleeping, and

concentrating, among others.

12.    Mr. Cahill's son also has a disability.  He has a congenital heart condition.

13.    Due to Mr. Cahill and his son's disabilities, Mr. Cahill's use of sick leave began to increase

on or around January 2018. Up until that point, he very rarely used sick leave.

14.    At that time, Mr. Cahill had a lot going on with his son's health and with his own health,

but he tried to keep his sick leave usage to days when he knew a replacement would be

available.

15.    In March 2018, his supervisor, Battalion Chief ("BC") Plunkett spoke to him about his use

of sick leave.  Mr. Cahill informed him that a lot of it was because of his son.  BC Plunkett

suggested that he use FMLA, but advised him to keep it to a minimum.

16.    At no time did AFD engage in the interactive process with Mr. Cahill.

17.    Mr. Cahill found this odd since the only time sick leave became a concern for management

was if one's balance was low or if more than one day was taken in a row.  Mr. Cahill's sick

leave balance was still high at that time and he had not taken more than one day in a row.

18.     In June 2018, Mr. Cahill began experiencing insomnia, nightmares, and mood changes because he was worried about AFD's perceptions of him as someone with PTSD and depression who needed to take medical leave not just for himself, but also for his disabled son's medical appointments.

19.     On July 18, 2018, Assistant Chief ("AC") Schultz had BC Bogozi deliver a disciplinary memorandum to Mr. Cahill accusing him of an "excessive" level of unscheduled sick leave and ordering him to produce doctors' notes "each time [he] utilize[d] sick leave of any type." This surprised Mr. Cahill given his positive/high leave balance, his leave use did not violate any established AFD policy, and the fact that he had not taken more than one sick day in a row. He was being held to a different standard than non-disabled firefighters.

20.     "Excessive" was an undefined, subjective assessment by AFD. AFD alleged that Mr. Cahill took 511 hours of sick leave; however, he worked 1,888 hours during that time. The 1,888 hours he worked shows that despite needing leave, Mr. Cahill was able to cover many other vacant shifts as a team player within AFD.

21.     Sick leave accrues at 5.5438 hours per pay period.  As of November 9, 2018, Mr. Cahill had over an 800 hour balance available for him to use.

22.     On July 31, 2018, Mr. Cahill saw a physician and the doctor completed and dated a U.S. Department of Labor, Certification of Health Care Provider for Employee's Serious Health Conditions (Family Medical Leave Act) form detailing the specifics of Mr. Cahill's medical condition, amount of leave needed, and additional information for further explanation.

23.     On August 3, 2018, Mr. Cahill received an excessive use of leave notice with an explanation of the new sick leave policy. AC Schultz published a new sick leave policy

with an extensive list of conditions that constitute "inappropriate sick leave." Mr. Cahill believes that this was targeted at him.

24. On August 5, 2018, Mr. Cahill delivered to BC Bogozi his FMLA paperwork and his grievance paperwork regarding the new sick leave policy from August 3, 2018 that defined "excessive" sick leave usage.

25. BC Bogozi reviewed the grievance and stated that he could not handle the matter at his level. He instructed Mr. Cahill to sign a document conveying his desire to proceed to Step 3, which the Chief or his designees review. In contravention of the grievance policy, Mr. Cahill never received a response to his Step 3 request.

26. On October 13, 2018, after attending training classes, working a full shift and working an overtime shift, Mr. Cahill used a day of sick leave to alleviate his PTSD symptoms.

27. The following Monday when Mr. Cahill returned to work, BC Cook on instruction from Deputy Chief ("DC") McMaster, told Mr. Cahill that he had to produce a doctor's note. Mr. Cahill knew this was contrary to AFD policy and told them that his one day absence was related to the medical leave paperwork that he had previously submitted to BC Bogozi.

28. BC Cook then stated that they had no record of Mr. Cahill's medical leave paperwork and AC Schultz demanded that Mr. Cahill produce a doctor's note on his next working day.

29. Mr. Cahill found a copy of the medical leave paperwork that he had previously submitted in August 2018, and took the paperwork to the Human Resources ("HR") himself to ensure it did not get "lost". Upon arrival Mr. Cahill learned that HR never received the original paperwork from BC Bogozi. That concerned Mr. Cahill given the seriousness of the health issues that he and his son were dealing with that he was seeking reasonable accommodations for in the form of medical leave.

30.     Mr. Cahill has faced retaliation as a result of advocating for his use of sick leave as a reasonable accommodation for his disability.

31.     On October 22, 2018, Mr. Cahill reported to an Aerial Operators class that he was required to take for his professional development. Upon arrival BC Jack Hoffman ordered him to leave the class and report directly to headquarters, which Mr. Cahill did.

32.     When Mr. Cahill arrived at headquarters that same day, DC McMaster informed him that HR had found his original medical leave paperwork, but that no action was taken because the information he had provided in the paperwork was too vague.

33.     DC McMaster told Mr. Cahill that he needed to resubmit the medical leave forms, and demanded a doctor's note for the leave he took on October 13, 2018. When Mr. Cahill could not produce a doctor's note because the absence was covered under his original medical leave paperwork that was submitted back in August 2018, **DC McMaster relieved Mr. Cahill from duty, dropped him from the professional development class, and threatened him with insubordination if he did not produce another doctor's note**.

34.     To date, AFD has failed to address how the medical information Mr. Cahill provided on multiple occasions from his personal physician was insufficient.

35.     Mr. Cahill believes that AC Schultz, DC McMaster, BC Fair and others in AFD management saw him less favorably because of his disabilities and request to take related sick leave. Mr. Cahill believes that they did not take his disability seriously and thought less of him for repeatedly requesting reasonable accommodations.

36.     On January 4, 2019, AC Schultz called Mr. Cahill into his office and gave him a minor discipline. In the discipline, he deducted 36 hours of annual leave plus 24 hours for October 22nd when Mr. Cahill was relieved from duty for "insubordination" because he could not

get a doctor's note for October 13th, which was covered under his  medical leave paperwork he had submitted.

37.   In Mr. Cahill's Step 4 grievance hearing on the matter, Mr. Cahill contested the wrongful discipline and deduction of 60 hours of his leave, the hearing officer, Sharron Vaughan-Roach decided in Mr. Cahill's favor. See excerpt from Step 4 Grievance Response below:

> *"In conclusion, you had sick leave approved from July 2018 through October 2018 with the exception of the 4 hours on July 2018. Additionally, you had FMLA approval starting October 1, 2018 through March 31, 2019. Based on these facts, I rule that **the Fire Department will re- instate the 36 hours of annual leave previously taken from you as a form of disciplinary action** except the 4 unapproved hours that transpired on July 20, 2018.  I also recommend that your request under Item 2 of your Remedial Actions be granted as follows:*
>
> ***Remove all references to my sick leave use from my personnel files; specifically, the counseling memo of 17 July 2018, references in my annual evaluation for 2018, the minor discipline of 4 January 2019 and any reference in the coming annual evaluation.*** *"*(emph. added).

38.   To date, AFD has not obeyed Ms. Vaughn-Roach's order for Mr. Cahill's 36 hours of leave to be restored.

39.   Given that he was never asked to sign a corrected evaluation, Mr. Cahill also believes that AFD has also ignored Ms. Vaughn-Roach's order that all references to Mr. Cahill's sick leave use from his personnel files; specifically, the counseling memo of 17 July 2018, references in his annual evaluation for 2018, the minor discipline of 4 January 2019 and any reference in the coming annual evaluation be removed. Mr. Cahill considers AFD's unwillingness to comply with the April 2019 hearing decision as retaliatory.

40.   Mr. Cahill submitted his medical leave paperwork on August 6, 2018, yet he was forced to wait **an entire six months** before his medical leave was finally approved on January 15, 2019. AFD's actions in this regard were unlawful, especially in light of the fact that AFD failed to engage in any timely interactive process.

41. Mr. Cahill believes that AFD's new sick leave policy with an extensive list of examples of that include "inappropriate use of sick leave" was created to adversely affect him by requiring him to provide a doctor's note for every day unscheduled sick leave he used no matter if he only used one day.

42. At no time during Mr. Cahill's 25 years of employment with AFD did he have any performance issues or face any discipline besides the "excessive use of unscheduled leave" discipline that Ms. Vaughn-Roach ordered AFD to remove from his file.

43. Mr. Cahill requested four hours of leave on July 18th to accompany his son to a cardiology appointment. Mr. Cahill later voluntarily canceled the leave when AFD could not find someone to fill in for him. Although AFD canceled Mr. Cahill's leave and he worked, AFD did not pay Mr. Cahill for the hours he worked. Mr. Cahill has proof that he was on duty in the form of two incident reports during that time. Mr. Cahill considers AFD's unwillingness to pay him for the hours he worked after cancelling the leave as retaliatory.

44. Mr. Cahill has two screen shots from Telestaff that show that he requested "scheduled sick" leave on March 24, 2019 for a doctor's appointment April 22, 2019. On April 19, 2019, it was approved but later someone changed it to "unscheduled sick leave", which had the effect of requiring him to bring a doctor's note according to the new August 3, 2018 policy. It also made Mr. Cahill look bad like he had called in sick at the last minute since requesting "scheduled" sick leave gave AFD advanced notice to look for a replacement.

45. This change in classifying Mr. Cahill's leave as unscheduled was done under Pat Lyons' login, the battalion aide (scheduling officer), and required a deliberate extra step in the process. Mr. Cahill believes this was a retaliatory action.

46.     On October 10, 2019, BC Hricik approved Mr. Cahill's request to attend a Resuscitation
        Academy class held in Howard County on November 7th and 8th, for eight hours each day.
        The class required Mr. Cahill to modify his regular twenty-four-hour shift scheduled for
        November 6th and 8th.

47.     Mr. Cahill advised AFD supervisors that he could work the twenty-four-hour shift on
        November 6th and attend the class after his duty beginning November 7th at 6:00 am.
        However, returning to work for an additional twelve hours after attending the second day
        of class, November 8th would be excessive and unsafe.

48.     Mr. Cahill properly requested an off-duty detail for such time.  If that were not possible,
        then Mr. Cahill would take leave or compensatory time.

49.     AFD routinely allowed employees to modify their shift to accommodate them in taking
        classes held outside the city. However, in Mr. Cahill's case DC McMaster refused to
        modify Mr. Cahill's schedule or provide reasonable accommodation, so that he could take
        leave after the class.

50.     During that time, BC Fair strongly objected to Mr. Cahill's leave request and made
        disparaging comments, including remarks about not taking Mr. Cahill off the schedule for
        an educational detail or leave. BC Fair complained that Mr. Cahill had scheduled sick leave
        several days after the Resuscitation Class.

51.     Mr. Cahill respectfully informed BC Fair that it was unsafe for him to return to work on
        the 8th after a twenty-four-hour shift on the November 6th, and an eight-hour class on the
        7th and 8th.

52.     Mr. Cahill also expressed to BC Fair his concerns about wanting to avoid leaving a last-minute shortage on the schedule and told him he felt unsafe given the continual hours worked and his lack of sleep.  Mr. Cahill had a PTSD flareup, which affected his sleep.

53.     BC Fair told Mr. Cahill that since there was a chance he would need sick leave after the class, they would cancel the detail (for him to attend the professional development class) altogether.

54.     BC Fair ordered Mr. Cahill to report for his regular duty shift on November 8th instead of attending the class. Mr. Cahill believes this was done in retaliation for him asking for a reasonable accommodation to take a day of sick leave after the class.

**Damages**

55.     Plaintiff has faced disparate treatment in professional development opportunities, leave usage, discipline, and workplace scrutiny due to his protected activity, as described above. The examples above show the coordinated attempts by Dube, Schultz, McMaster, and Fair to target and retaliate against Mr. Cahill related to his need to take sick leave to address him and his son's disability.

56.     The ongoing harassment and retaliation have negatively affected Mr. Cahill.

57.     Due to the stress of not being able to take his earned medical leave and being punished on days when he did take medical leave, Mr. Cahill has experienced humiliation and embarrassment. He has also experienced sleeplessness, nightmares, loss of appetite, depression, inability to focus, moodiness, general anxiety, loss of joy, hopelessness, decreased energy, and his PTSD has worsened.

58.     The work-related stress has also caused strained relationships between Mr. Cahill and his family and friends and loss of time with his wife and children.

59.     Mr. Cahill did not want AFD colleagues learning about his disability, but now all of his colleagues know.

60.     Mr. Cahill is disappointed by how Dube, Schultz, McMaster and Fair discriminated and retaliated against him.  He hoped things would get better for him in the department, but he believes that in reality, any chance for a future in the department has been destroyed since he has been marked as someone with mental health disabilities who has advocated for reasonable accommodations and his use of earned medical leave.

61.     Mr. Cahill would like those wrongs to be corrected. The April 24, 2019 reversal of AFD's discipline at Mr. Cahill' Step 4 grievance hearing is just one example that the City has the means to correct the wrongs that have been done to Mr. Cahill, but it is also an example of how brazen AFD is in that it has still not obeyed the remedies Ms. Vaughn-Roach ordered, as described in ¶¶ 37-39, above.

## COUNT I: ADA DISABILITY DISCRIMINATION

62.     Plaintiff Mr. Cahill re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

63.     The ADA prohibits employers from discriminating against their employees because of a disability or perceived disability, or because of an employee's association with a person with a disability.

64.     Defendant was at all times relevant to this matter and currently is, the employer of Mr. Cahill for all purposes under the ADA.

65.     Mr. Cahill's PTSD and depression substantially limit his major life activities of working, sleeping, and concentrating, among others.

66.     Mr. Cahill's son's congenital heart condition is a disability that substantially limits his major life activities.

67.     Plaintiff, because of his disability, was denied terms and conditions of employment in violation of the ADA, as described above.

68.     Defendant and its agents knew of Mr. Cahill's disability and Mr. Cahill's son's disability, and of Mr. Cahill's requests for reasonable accommodations for sick leave.

69.     Defendant and its agents treated Mr. Cahill in a disparate manner, giving favor, opportunities, and advantages to non-disabled employees while depriving him of similarly situated favorable opportunities, advantages, and treatment.  Defendant denied Mr. Cahill opportunities to attend professional development trainings due to his requests for sick leave.

70.     Mr. Cahill was able to fulfill his duties as a paramedic while also caring for himself and his son.

71.     Defendants' discrimination against Plaintiff was an intentional or reckless disregard of Plaintiff's rights under the ADA.

72.     Defendant engaged in the discriminatory actions described above with malice, or with a reckless indifference to Plaintiff's legal rights, subjected him to adverse terms and conditions of employment because of his disability in violation of the ADA.

73.     Plaintiff has been damaged as a result of Defendants' willful, intentional and unlawful conduct. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, continues to suffer, and will in the future suffer humiliation, emotional distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages,

including damage to his professional reputation and career, litigation expenses including attorney's fees, accrued interest and other injuries.

## COUNT II: VHRA DISABILITY DISCRIMINATION

74. Plaintiff Mr. Cahill re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

75. The VHRA prohibits employers from discriminating against their employees because of a disability or perceived disability.

76. Defendant was at all times relevant to this matter and currently is, the employer of Mr. Cahill for all purposes under the VHRA.

77. Mr. Cahill's PTSD and depression substantially limit his major life activities of working, sleeping, and concentrating, among others.

78. Plaintiff, because of his disability, was denied terms and conditions of employment in violation of the VHRA, as described above.

79. Defendant and its agents knew of Mr. Cahill's disability.

80. Defendant treated Mr. Cahill in a disparate manner, giving favor, opportunities, and advantages to non-disabled employees while depriving him of similarly situated favorable opportunities, advantages, and treatment.

81. Defendants' discrimination against Plaintiff was an intentional or reckless disregard of Plaintiff's rights under the VHRA.

82. Defendant engaged in the discriminatory actions described above with malice, or with a reckless indifference to Plaintiff's legal rights, subjected him to adverse terms and conditions of employment because of his disability in violation of the VHRA.

83.     Plaintiff has been damaged as a result of Defendants' willful, intentional and unlawful conduct. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, continues to suffer, and will in the future suffer humiliation, emotional distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to his professional reputation and career, litigation expenses including attorney's fees, accrued interest and other injuries.

## COUNT III: ADA RETALIATION

84.     Mr. Cahill re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

85.     Plaintiff, because of his disability, was denied terms and conditions of employment in violation of the ADA.

86.     Plaintiff is a person protected by said provisions of the ADA.

87.     Defendant's discrimination against Plaintiff was an intentional or reckless disregard of Plaintiff's rights under the ADA.

88.     Defendant engaged in retaliation in violation of the ADA in connection with their treatment of Plaintiff and the terms and conditions of Plaintiff's employment.

89.     Schultz, McMaster, Dube and Fair, in their positions as Plaintiff's supervisors, engaged in retaliation in violation of ADA.

90.     Mr. Cahill engaged in protected activity when he made complaints to AFD management, HR, his union, and the EEOC about the discrimination and retaliation he was suffering, as described above.

91.     Defendant was aware of the protected activity in which Mr. Cahill engaged, as described above.

92.  Defendant retaliated against Mr. Cahill by issuing him discipline that his coworkers who had not engaged in protected activity did not receive, as described above.

93.  In doing the acts and engaging in the conduct herein alleged, Defendant intended to and did vex, harass, annoy, and cause Plaintiff to suffer and continue to suffer emotional distress.

94.  Plaintiff has been damaged as a result of Defendants' willful, intentional and unlawful conduct.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, continues to suffer, and will in the future suffer humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to his reputation and good will, litigation expenses including attorney's fees, and consequential damages, and other injuries

## COUNT IV: FMLA INTERFERENCE & RETALIATION

95.  Mr. Cahill re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

96.  Under the FMLA, an "eligible employee" is entitled to take up to twelve weeks of unpaid leave in any twelve-month period for qualifying medical or family reasons. 29 U.S.C. § 2612(a)(l) (2013).

97.  An "eligible employee" is one "who has been employed for at least 12 months by the employer with respect to whom leave is requested ... for at least 1,250 hours of service with such employer during the previous 12-month period, [and] is employed at a worksite where 50 or more employees are employed by the employer within 75 miles of that worksite." 29 U.S.C. § 2611(2)(A); 29 C.F.R. § 825.110(a) (brackets added).

- 15 -

98.    At all times pertinent and relevant to this complaint, Mr. Cahill was an FMLA-eligible employee, as he had been employed by the AFD since April 25, 1994, without a break in employment or service, exceeding twelve (12) months worked. Mr. Cahill held a full-time position for his entire employ with the City and worked at least 1,250 hours during the twelve (12) months preceding the date of FMLA.

99.    A city or town is considered a single public agency and, therefore, a single employer for purposes of determining employee eligibility under the FMLA. 29 C.F.R. § 825.108(c)(l).

100.   The City is subject to the requirements of the FMLA as a public, government agency.

101.   A "serious health condition" is defined as an "illness, injury, impairment, or physical or mental condition that involves inpatient care ... or continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

102.   "Continuing treatment" includes "a period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition that also involves treatment two or more times, within 30 days of the first day of incapacity ... by a health care provider ... or treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider." "[T]reatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity." 29 C.F.R. § 825.l 15(a)(l)-(3).

103.   Mr. Cahill's medical condition of depression qualified as a serious health condition. Mr. Cahill had on-going and continuing treatment from his doctor. Mr. Cahill's symptoms included, but were not limited to PTSD flareups, inability to sleep, tiredness, fatigue; and inability to focus and concentrate.

104.   In January 2018, Mr. Cahill began taking more sick leave due to his serious health conditions of depression and PTSD. The City, and/or agents or employees acting on its behalf, failed to engage in an interactive process with Mr. Cahill and failed to timely determine whether his FMLA leave should have been approved and granted either on an intermittent leave basis as medically necessary to seek treatment from his health care providers and/or on a continuous leave basis.

105.   "[E]mployers cannot use the taking of FMLA leave as a negative factor m employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under no fault attendance policies." 29 C.F.R. § 825.220(c).

106.   The City, and its agents or employees acting on its behalf, did not timely offer Mr. Cahill FMLA leave for him and his son's serious medical conditions; failed to timely respond to Mr. Cahill's request for FMLA leave and violated his rights by discipling him and threatening him with discipline and charges of insubordination rather than assisting him with pursuing his rights under FMLA.

107.   The City did not have a legitimate business reason for its decision to discipline Mr. Cahill.

108.   Because of Plaintiff Mr. Cahill's PTSD, depression, and his son's congenital heart condition, Plaintiff sought protected medical leave under FMLA.

109.   Plaintiff has been damaged as a result of Defendant's willful, intentional and unlawful conduct. As a direct and proximate result of Defendant's conduct, Defendant is additionally liable to Mr. Cahill for those damages, as well as an additional amount as liquidated damages, attorneys' fees, the costs of litigation, and accrued interest.

## **<u>RELIEF SOUGHT</u>**

**WHEREFORE**, Plaintiff Cahill, by counsel, requests that this Court award damages against Defendant respectfully requests the Court to:

A.      Enter judgment for Plaintiff against Defendant on all Counts;

B.      Declare that the conduct of Defendant is a willful violation of the Plaintiff's rights as secured by the ADA, FMLA and VHRA;

C.      Award Mr. Cahill compensatory damages for the emotional distress injuries and losses he suffered, plus past and future pecuniary damages on each of the above-stated Counts;

D.      Award Mr. Cahill remuneration and privileges of employment retroactive to the date of any unlawful action found to have occurred in this case;

E.      Award Cahill pecuniary and out-of-pocket expenses;

F.      Award Mr. Cahill an additional amount as liquidated damages;

G.      Enjoin Defendant from future retaliation and discrimination against Mr. Cahill;

H.      Order Defendant to pay all reasonable attorneys' fees, expert costs, court costs, and expenses incurred by Mr. Cahill as a result of Defendant's actions and inactions, as well as pre- and post-judgment interest; and

I.      Order such other equitable and legal relief as the Court deems necessary and appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**


Dated: December 24, 2019                    **MICHAEL CAHILL**

                                            By Counsel:

___/s/ _____
Monique A. Miles, Esq.
VSB # 78828
Old Towne Associates, P.C.
216 South Patrick Street
Alexandria, Virginia 22314-3528
Ph: 703-519-6810
Fax: 703-549-0449
mmiles@oldtowneassociates.com


*Attorney for Plaintiff*